UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| MELINDA SPENCER et al., | Plaintiffs/Counter Defendants, |
| v. | Civil Action No. 3:20-cv-803-DJH-RSE |
| KING FINANCIAL REPAIR, LLC, | Defendant/Counter Claimant. |

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Melinda Spencer, Bobetta Long, Alison Smith, and Andre Woods allege that Defendant King Financial Repair, LLC charged them for credit-repair services before fully performing the services, made untrue or misleading representations of its services, and committed or attempted to commit fraud on them in connection with its services, in violation of the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq*.  (Docket No. 1)  King asserts several counterclaims against Spencer and Long (D.N. 6) and now moves for summary judgment on Plaintiffs' claims and its breach-of-contract counterclaims.  (D.N. 29)  King also moves to file its motion for summary judgment under seal, and Plaintiffs move to file their response to the summary-judgment motion under seal.  (D.N. 28; D.N. 33)  For the reasons explained below, the Court will deny the motions to seal and grant in part and deny in part King's motion for summary judgment.

**I.**

King is a credit-repair organization (CRO) that assists consumers "in achieving an accurate credit report."  (D.N. 29-3, PageID.114; *see* D.N. 29-2, PageID.100)  To this end, it contracts with DisputeSuite Mirku, a third-party vendor, to draft and mail letters to credit bureaus "request[ing] the removal of errors, misrepresentations, or unverifiable information" on the consumer's credit

1

reports. (D.N. 29-3, PageID.117; *see* D.N. 29-2, PageID.103–05; D.N. 34-1, PageID.435) King reviews the letters before DisputeSuite mails them. (D.N. 29-2, PageID.105)

Plaintiffs are consumers who had initial consultations with King regarding credit repair. (*See* D.N. 29-6, PageID.155–56; D.N. 29-17, PageID.280; D.N. 29-21, PageID.316–17; D.N. 29-25, PageID.380) During its initial consultations, King sets up the client's case file, audits the client's credit reports, and "develop[s] a plan to delete, correct or change inaccurate, unverifiable and obsolete items" on the reports. (D.N. 29-3, PageID.117) King charged Woods and Smith $199 and Spencer and Long $299 after their consultations.[1] (*See* D.N. 29-6, PageID.155–56; D.N. 29-17, PageID.280; D.N. 29-21, PageID.316–17; D.N. 29-25, PageID.380; D.N. 34-2, PageID.444; D.N. 34-3, PageID.447; D.N. 34-4, PageID.450; D.N. 34-5, PageID.453)

Spencer, Long, and Smith ultimately entered into contracts with King.[2] (D.N. 29-3; D.N. 29-15; D.N. 29-22) Pursuant to these contracts, they agreed to pay King a monthly fee in exchange for its services. (*See* D.N. 29-3; D.N. 29-15; D.N. 29-22) King's services included

> the continuing analysis/audit of up to three credit bureau reports per client, all correspondence associated with the credit improvement process, the review for changes requested by the Client to the Client's credit reports as a result of contacts made on the Client's behalf with each applicable credit bureau, creditor or public record holder, phone consultations (up to 20 minutes per month is included in the fee) with client and the continuing planning and creation of documents for the purpose of credit report improvement.

(D.N. 29-3, PageID.117; D.N. 29-15, PageID.264; D.N. 29-22, PageID.337) The contract states that King would charge its clients for the preceding month's services "after the services have been fully performed." (D.N. 29-3, PageID.117; D.N. 29-15, PageID.264; D.N. 29-22, PageID.337)

---

[1] Woods and Smith received a $100 discount on their consultations. (*See* D.N. 34-3, PageID.447; D.N. 34-5, PageID.453)
[2] Woods paid the initial consultation fee but did not enter into the contract with King. (*See* D.N. 29-25, PageID.384) King does not claim that Woods owes it any money. (*See* D.N. 6; D.N. 29-1)

Spencer, Long, and Smith opted into King's "B(2)" payment plan, agreeing to pay King $147 per month for at least six months. (D.N. 29-3, PageID.117; D.N. 29-15, PageID.264; D.N. 29-22, PageID.337) The contracts allowed King to calculate their charges differently, however, if they canceled the contract or refused payment within the six-month period: Under its "B(1)" pricing plan and in lieu of $147 per month, King charged $235 per hour "and/or $75 per investigated item." (D.N. 29-3, PageID.117; D.N. 29-15, PageID.264; D.N. 29-22, PageID.337) King also assessed $30 for each "dishonored payment" and $100 for each "chargeback," or client-requested refund from the client's bank. (D.N. 29-3, PageID.118; D.N. 29-15, PageID.265; D.N. 29-22, PageID.338)

Spencer had an initial consultation, signed her contract, and paid the $299 consultation fee on June 19, 2020. (*See* D.N. 29-3; D.N. 34-2, PageID.444) She paid $147 on July 19, August 19, and September 19 but initiated a chargeback of $147 on September 20. (D.N. 34-2, PageID.444; *see* D.N. 29-3, PageID.118) In total, Spencer paid King $593. (D.N. 34-2, PageID.444) King asserts that its alternative pricing plan applies, and that Spencer therefore owes an additional $3,556: $75 for each of the fifty items that it disputed on Spencer's behalf; $299 for her initial consultation; and $100 for the chargeback. (*Id.*)

Long had an initial consultation with King, paid $1, and signed her contract on August 18, 2020. (*See* D.N. 29-15; D.N. 29-17, PageID.283–84; D.N. 34-4, PageID.450) She paid the remaining $298 of her initial fee on August 21 and made one $147 payment on September 21. (D.N. 34-4, PageID.450) Long terminated her contract in late September or early October and then initiated chargebacks of her $298 and $147 payments, but not the $1 payment, on November 4. (*See* D.N. 29-17, PageID.284–88; D.N. 34-4, PageID.450) King alleges that its alternative pricing plan applies and that Long owes $5,748: $299 for the initial consultation; $75 for each of

3

the seventy items that it disputed on her behalf; and $100 per chargeback, less $1 for her previous payment. (*See* D.N. 34-4, PageID.450)

Smith had an initial consultation, signed her contract, and paid the initial $199 consultation fee on March 17, 2020. (D.N. 29-22; *see* D.N. 34-3, PageID.447) She paid King $147 on April 17, May 17, June 17, July 17, August 17, and October 10, 2020. (*See* D.N. 34-3, PageID.447) In total, Smith paid King $1,081. (*See id.*) King does not assert that Smith owes it any money. (*See* D.N. 6; D.N. 29-1)

Plaintiffs filed this action on December 1, 2020, alleging several violations of the CROA, 15 U.S.C. § 1679 *et seq*. (D.N. 1) Plaintiffs assert that King improperly charged them before fully performing its services (Count I); made untrue or misleading representations of its services (Count II); and committed or attempted to commit a fraud or deception on them in connection with its services (Count III). (*Id.*) King counterclaims for breach of contract, defamation, and interference with prospective contractual relationships against Spencer and breach of contract against Long. (D.N. 6) King now moves for summary judgment on Plaintiffs' claims and on its breach-of-contract counterclaims. (D.N. 29) King also moves to seal its summary-judgment motion, and Plaintiffs move to seal their response. (D.N. 28; D.N. 33)

## II.

**A.    Motions to Seal**

King moves to file its motion for summary judgment under seal, and Plaintiffs move to file their response under seal. (D.N. 28; D.N. 33) In support of their motions, the parties assert that the motion for summary judgment and response contain "confidential information" and cite exhibits that the Court has already placed under seal. (D.N. 28, PageID.73; D.N. 33, PageID.407) But there is a "'strong presumption in favor of openness' regarding court records," *Rudd Equip.*

*Co. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 593 (6th Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)), and no party has articulated, nor has the Court discerned, what "confidential information" in the motion or response justifies sealing them. (D.N. 28; D.N. 33; *see* D.N. 29-1; D.N. 34) The Court is therefore unable to satisfy its obligation to issue "specific findings and conclusions" showing that a seal is warranted for either document. *Rudd*, 834 F.3d at 594. Accordingly, it will deny the motions to seal.[3] *See id.* at 595 (noting that "[o]nly the most compelling reasons can justify non-disclosure of judicial records" (quoting *Brown & Williamson*, 710 F.2d at 476)); *S. Fin. Grp., LLC v. Stoess*, No. 3:18-CV-220-DJH, 2018 WL 10758704, at *1 (W.D. Ky. June 22, 2018) (denying motion to seal when movant cited only "a vague interest in 'privacy' as grounds for its request").

**B.    Motion for Summary Judgment**

Summary judgment is appropriate when a movant shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). If the nonmovant "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)–(3).

---

[3] The Court's prior Order granting King's motion to seal the exhibits attached to its summary-judgment motion remains in place. (*See* D.N. 35)

### 1. Count I

Plaintiffs assert in Count I that King charged them before fully performing its services, in violation of the CROA. (D.N. 29)  The CROA prohibits a credit-repair organization from charging or receiving any money "for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b).  Plaintiffs contend that King violated this provision by charging them monthly "without regard to whether its credit repair services [we]re 'fully' performed" in the preceding month. (D.N. 34, PageID.419)  King moves for summary judgment on Count I, arguing that it charged Plaintiffs only when it fully performed its services in accordance with the contract. (D.N. 29-1, PageID.93)  In support, King submits "activity reports," which show when it provided services for Spencer, Long, and Smith. (D.N. 29-9; D.N. 29-18; D.N. 29-23)

While several courts have held that a CRO violates § 1679b(b) when it demands payment in full before it begins providing services, *see, e.g.*, *F.T.C. v. Lalonde*, 545 F. App'x 825, 838 (11th Cir. 2013); *Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 754–55 (N.D. Ill. 2011), few courts have discussed the legality of charging a monthly payment in exchange for ongoing credit-repair services. *See* § 1679b(b).  In *DuCharme v. Heath*, No. C 10-02763 CRB, 2010 WL 5211502 (N.D. Cal. Dec. 16, 2010), the court rejected the same interpretation proposed by Plaintiffs here, concluding that the "CROA's ban on advance payments for work that has not been fully performed cannot mean that credit bureaus are not to be paid until *all* work on a client's behalf is completed." *Id.* at *5.  It reasoned that the statute "speaks of 'any service,'" which "includes services big and small" and noted that "determining when all work on a client's behalf has been 'fully performed' is untenable." *Id.* at *4–5.  Consequently, the court found it permissible for a CRO to charge a client "on a monthly basis" for tasks "that were indisputably performed during the previous

month," even if those tasks were not "big-ticket items." *Id.* at *4–6. The Court agrees with this reasoning. Section 1679b(b) prohibits charging a client before "any service" is "fully performed," and "any service" includes all types of credit-repair services. § 1679b(b); *see DuCharme*, 2010 WL 5211502, at *5. A CRO, for example, may charge a client after setting up the client's credit file, reviewing the client's credit report, and drafting a single round of letters to send to credit bureaus. *See, e.g.*, *Reid v. Commonwealth Equity Grp., LLC*, No. 17-CV-3043, 2017 WL 3457109, at *5 (C.D. Ill. Aug. 11, 2017); *DuCharme*, 2010 WL 5211502, at *5.

Plaintiffs cite *Rannis v. Fair Credit Lawyers, Inc.*, 489 F. Supp. 2d 1110 (C.D. Cal. 2007), *aff'd*, *Rannis v. Recchia*, 380 F. App'x 646 (9th Cir. 2010), to support their interpretation of § 1679b(b), but *Rannis* involved a CRO that indisputably mailed letters to credit-repair bureaus on the plaintiff's behalf after charging him a lump sum. *See* 489 F. Supp. 2d at 1117. Here, the issue is whether King performed any services justifying the monthly charges. *See DuCharme*, 2010 WL 5211502, at *6 n.4 (citing *Rannis*, 489 F. Supp. 2d at 1117 ("Defendant does not present any evidence contradicting the fact that the actual amount paid was consideration for services that Defendant later performed.")). Moreover, Plaintiffs do not explain how a CRO would satisfy the full-performance requirement under their interpretation—would it fulfill its statutory obligation to "fully perform[]" a service once it receives responses from credit bureaus or "only if a disputed item is successfully removed from a client's report?" *Id.* at *5. Like the court in *DuCharme*, the Court finds that "any service" includes both "big-ticket items" and the "smaller, component parts" needed to accomplish the bigger tasks. *Id.*; *see Reid*, 2017 WL 3457109, at *4 ("[T]he statute itself provides that a credit repair organization may not charge for the performance of 'any service' before 'such service' is fully performed but does not refer to all services being performed before the client is charged."). King is therefore entitled to summary judgment on Count I if it

7

demonstrates that it performed "any" credit-repair service on Plaintiffs' behalf in the month preceding every charge. *See Reid*, 2017 WL 3457109, at *4; *DuCharme*, 2010 WL 5211502, at *4–5; *cf. Lalonde*, 545 F. App'x at 838 (finding a violation of § 1679b(b) where the CRO demanded payment in full before performing any credit-repair services); *F.T.C. v. Gill*, 265 F.3d 944, 956 (9th Cir. 2001) (finding a statutory violation where the CRO required a down payment before performing any credit-repair services).

The undisputed record shows that King analyzed the Plaintiffs' credit reports during initial consultations and charged them either $199 or $299 after the consultations. (*See* D.N. 29-9, PageID.235; D.N. 29-18, PageID.297; D.N. 29-23, PageID.346–47; D.N. 34-2, PageID.444; D.N. 34-3, PageID.447; D.N. 34-4, PageID.450; D.N. 34-5, PageID.453) These charges were therefore proper. *See Reid*, 2017 WL 3457109, at *5 (finding fee charged after the CRO set up the plaintiff's credit file and analyzed his credit report proper). Because the initial consultation fee was Woods's only charge (*see* D.N. 29-25, PageID.380, 384; D.N. 34-5, PageID.453), the Court will grant summary judgment as to Woods on Count I. *See Reid*, 2017 WL 3457109, at *5.

### a. Long

Long signed her contract with King on August 18, 2020, and King mailed letters to credit bureaus on August 25, contesting several items on Long's credit reports. (*See* D.N. 29-18, PageID.296) King charged Long $147 on September 21. (D.N. 34-4, PageID.450) Long terminated her contract in late September or October and initiated chargebacks of her payments to King on November 4. (*See* D.N. 29-17, PageID.284–88; D.N. 29-18, PageID.296; D.N. 34-4, PageID.450) King has demonstrated that it fully performed a service by mailing letters to credit bureaus on Long's behalf in the month preceding the September 21 charge and did not charge her in future months. (*See* D.N. 29-18, PageID.296; D.N. 34-4, PageID.450) The Court will

accordingly grant summary judgment as to Long's claim on Count I. *See DuCharme*, 2010 WL 5211502, at *4–5.

### b. Spencer

According to Spencer's activity log, King mailed letters to credit bureaus on June 24, 2020, contesting several items on Spencer's credit reports and charged her $147 on July 19. (*See* D.N. 29-9, PageID.226; D.N. 34-2, PageID.444) King mailed a second round of letters on August 10 and charged Spencer its $147 monthly fee on August 19. (*See* D.N. 29-9, PageID.225–26; D.N. 34-2, PageID.444) Although Spencer's account with King was "viewed" twice on August 20, the activity log shows no other activity until September 21. (*See* D.N. 29-9, PageID.224) Nevertheless, King charged Spencer $147 on September 19. (*See* D.N. 34-2, PageID.444) Spencer initiated a chargeback of her August 19 payment on September 20, but King mailed a third round of letters on September 24. (*See* D.N. 29-9, PageID.223; D.N. 34-2, PageID.444) Spencer ultimately attempted to "cancel" her contract through "[e]mail, text message, phone call, [and] Facebook" but did not send King the cancellation form attached to the contract. (D.N. 29-6, PageID.159)

King has established that it mailed letters to credit agencies for Spencer on June 24 and August 10, and then charged Spencer on July 19 and August 19 for those letters, respectively. (*See* D.N. 29-9, PageID.224–26; D.N. 34-2) It has not demonstrated, however, that it performed any services justifying the September 19 charge, as Spencer's activity log states only that someone "viewed" her profile prior to the charge. (*See* D.N. 29-9, PageID.224; D.N. 34-2) Because a genuine issue of material fact exists as to whether King fully performed any services before the September charge, the Court will deny summary judgment on Count I as to Spencer. *See* § 1679b(b); *DuCharme*, 2010 WL 5211502, at *4–5.

### c. Smith

King mailed form letters to credit bureaus on Smith's behalf on March 22, 2020, and charged her on April 17. (*See* D.N. 29-23, PageID.345; D.N. 34-3, PageID.447) It mailed a second round of letters to the bureaus on May 9 and charged her its $147 monthly fee on May 17. (*See* D.N. 34-3, PageID.447) King charged Smith again on June 17 but did not send the third round of letters until July 7. (*See id.*) It charged Smith its monthly fee on July 17 and August 17. (*See id.*) King mailed a fourth round of letters to credit agencies on September 11. (*See id.*) Smith then called King to cancel her contract. (*See* D.N. 29-21, PageID.326) King, however, told her that it had already mailed the final round of letters and ultimately charged her for the final time on October 1. (*See id.*; D.N. 34-3, PageID.447)

The record shows that King charged Smith on April 17, May 17, July 17, and October 1 for letters that it sent in the preceding months. (*See* D.N. 29-23; D.N. 34-3) King has provided no evidence, however, that it performed any services for Smith justifying its charges on June 17 and August 17. (*See* D.N. 29-23; D.N. 34-3) Because a genuine issue of material fact exists regarding whether King fully performed any services before the June and August charges, the Court will deny summary judgment on Count I as to Smith. *See* § 1679b(b); *DuCharme*, 2010 WL 5211502, at *4–5.

### 2. Counts II and III

Plaintiffs also assert violations of 15 U.S.C. § 1679b(a), which prohibits a CRO from making or using "any untrue or misleading representation" of its services. 15 U.S.C. § 1679b(a)(3). The statute additionally makes it unlawful for a CRO to "engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale

of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(4). Plaintiffs contend that King violated the statute by hiring an attorney to send a debt-collection letter to Spencer and by posting Spencer's credit information on social media through its "principal" Julia King.[4] (D.N. 29-1, PageID.78; D.N. 34, PageID.421–22; *see* D.N. 34-7; D.N. 34-8)  Defendant moves for summary judgment on Counts II and III, arguing that this conduct does not violate § 1679b(a)(3) or (a)(4). (D.N. 29-1)

A CRO violates § 1679b(a)(3) when it makes misleading or untrue representations about its services. *See* § 1679b(a)(3); *see also, e.g.*, *Helms v. Consumerinfo.com, Inc.*, 436 F. Supp. 2d 1220, 1237 (N.D. Ala. 2005) (denying summary judgment for defendant when plaintiff showed that defendant's website, which advertised its credit-repair services, contained statements that a reasonable jury could find misleading). Courts have found conduct improper under § 1679b(a)(3) where, for example, a CRO guaranteed that consumers would be approved for loans after the credit-repair process, *see F.T.C. v. 1st Guar. Mortg. Corp.*, No. 09-CV-61840, 2011 WL 1233207, at *10 (S.D. Fla. Mar. 30, 2011), or informed consumers that it would continue to monitor their credit reports for twelve months but failed to do so. *See Greene*, 853 F. Supp. 2d at 755–56; *see also Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 278–79 (D. Mass. 2008), *aff'd*, *Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010) (finding a violation of § 1679b(a)(3) where defendant represented that it was a nonprofit entity but transferred its clients' accounts to a for-profit organization). Section 1679b(a)(4) is "more specific" than § 1679b(a)(3) and, "consistent with the requirements of fraud, requires a showing of reliance and actual

---

[4] While Plaintiffs submit an exhibit showing that Julia King and Spencer exchanged comments on social media regarding Spencer's contract with King, they have not provided any evidence that Julia King posted Spencer's credit information on social media. (*See* D.N. 34-8)

11

damages." *Helms*, 436 F. Supp. 2d at 1236.  Both provisions prohibit misrepresentations "about 'the services of a credit repair organization.'" *Id.* at 1234.

King's conduct—sending a debt-collection letter through an attorney to Spencer and purportedly posting Spencer's credit information on social media (*see* D.N. 34-7; D.N. 34-8)—does not fall within § 1679b(a)(3) or (a)(4) because Plaintiffs have failed to demonstrate that King falsely, deceptively, or fraudulently represented its services as a CRO in either the letter or the alleged post. *See Helms*, 436 F. Supp. 2d at 1234.  That is, neither the letter nor the post involved misleading or false statements about King's services or results. *See* § 1679b(a)(3)–(4); *Helms*, 436 F. Supp. 2d at 1234.  At bottom, Plaintiffs have provided evidence only that King attempted to collect an alleged debt from Spencer. (*See* D.N. 34-7)  The Court will accordingly grant summary judgment for King on Counts II and III.

### 3. Counterclaim

King also moves for summary judgment on its breach-of-contract counterclaims against Spencer and Long.  (D.N. 29)  To prove breach of contract, King must establish (1) "existence of a contract"; (2) "breach of that contract"; and (3) "damages flowing from the breach of contract." *Henderson v. Skyview Satellite Networks, Inc.*, 474 F. Supp. 3d 893, 904 (W.D. Ky. 2020) (quoting *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009)) (internal quotation marks omitted).  In support of its motion, King submits the contracts signed by Spencer on June 19, 2020, and Long on August 18, 2020.  (*See* D.N. 29-3; D.N. 29-15)  The record also shows that Spencer and Long initiated chargebacks of their monthly payments in September and November 2020, respectively, and thereafter failed to make any additional payments to King. (*See* D.N. 29-19; D.N. 34-2; D.N. 34-4)

As previously discussed, King has not demonstrated that it performed any credit-repair services for Spencer in the month preceding her September 19 charge, even though the contract permitted King to charge her only after the prior month's services were "fully performed." (*See* D.N. 29-9; D.N. 34-2) Because a genuine issue of material fact exists as to whether King breached the contract prior to Spencer's nonpayment by charging her before providing its services, the Court cannot grant summary judgment for King on its breach-of-contract counterclaim against Spencer. *See Owensboro Mercy Health Sys., Inc. v. Willis N. Am., Inc.*, No. CIV.A. 06-586-C, 2009 WL 1405172, at *4 (W.D. Ky. May 18, 2009) (denying motion for summary judgment on breach-of-contract claim when a genuine issue of material fact remained as to whether the movant complied with the terms of its contract); *cf. Graves v. Standard Ins. Co.*, No. 3:14-CV-00558-CRS-DW, 2016 WL 6875786, at *4 (W.D. Ky. Nov. 21, 2016) (granting summary judgment for defendant where no genuine issue of material fact remained as to whether plaintiff, but not defendant, breached their contract).

In contrast, King is entitled to summary judgment on its breach-of-contract counterclaim against Long because King has demonstrated that it fulfilled its contractual obligations before each charge. (*See* D.N. 29-18; D.N. 29-20; D.N. 34-4) Long had an initial consultation with King in August 2020 and then paid King's $299 consultation fee in two payments of $1 and $298. (*See* D.N. 29-17, PageID.283; D.N. 34-4, PageID.450) After Long signed the contract on August 18, King mailed letters to three credit bureaus on August 25, challenging several items on her credit reports. (*See* D.N. 29-15; D.N. 29-20) Long paid King's $147 monthly fee on September 21 but terminated her contract in late September or October and initiated chargebacks of her $298 and $147 payments on November 4. (*See* D.N. 29-17, PageID.284–88; D.N. 29-18, PageID.296; D.N. 34-4, PageID.450)

Pursuant to the contract, Long's cancellation only one month after signing the contract allowed King to charge her in accordance with its alternative pricing plan. (*See* D.N. 29-15, PageID.264–66) In the absence of a meaningful defense to the breach-of-contract counterclaim, King is entitled to summary judgment because there is no genuine issue of material fact that it provided credit-repair services to Long in accordance with their contract; Long failed to pay for those services; and King incurred damages as a result of Long's nonpayment. *See Ohio Farmers Ins. Co. v. Charlie's Elec. Serv., Inc.*, No. 1:16-CV-00101-GNS, 2017 WL 1380470, at *2–4 (W.D. Ky. Apr. 14, 2017) (granting summary judgment on plaintiff's breach-of-contract claim when it established that defendant failed to perform as agreed in the parties' contract); *Graves*, 2016 WL 6875786, at *4; *Bellsouth Telecomms., LLC v. Serenity, Inc.*, No. CIV.A. 5:14-139-KKC, 2015 WL 3690302, at *1 (E.D. Ky. June 12, 2015) (granting summary judgment on plaintiff's breach-of-contract claim when it showed that defendant failed to pay plaintiff for its services, thereby violating the parties' contract).

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)  Plaintiffs' motion to seal (D.N. 33) is **DENIED**.

(2)  King's motion to seal (D.N. 28) is **DENIED**.

(3)  King's motion for summary judgment (D.N. 29) is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to Long on Counts I, II, and III, and King's breach-of-contract counterclaim; as to Spencer and Smith on Counts II and III; and as to Woods

on Counts I, II, and III. The motion is **DENIED** as to Spencer and Smith on Count I and as to Spencer on King's breach-of-contract counterclaim.

(4) The Court requests that within **thirty (30) days of entry** of this Memorandum Opinion and Order, Magistrate Judge Regina S. Edwards (D.N. 4) conduct a status conference with the parties to set a final trial schedule and, at her discretion, a settlement conference.

July 6, 2022

David J. Hale, Judge
United States District Court